IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| VRF EYE SPECIALTY GROUP, PLC, | ) |
| Plaintiff, | ) ) ) |
| v. | ) CIVIL ACTION NO. _____ ) |
| SETH M. YOSER, M.D., JAMES BAIZE, AND MEDICAL SOLUTIONS, LLC. | ) ) ) JURY TRIAL DEMANDED ) |
| Defendant. | ) ) |

## VERIFIED COMPLAINT

Plaintiff VRF Eye Specialty Group, PLC ("VRF" or "the Practice") hereby files this Verified Complaint against Defendant Seth M. Yoser, M.D., James Baize and Medical Solutions, LLC, stating as follows:

## SUMMARY

1. VRF is a multi-physician medical and surgical vision practice in the Mid-South. Dr. Yoser was a member of the Practice, bound by the Operating Agreement he had signed. That Agreement required each physician in the practice to abide by practice standards (§6.7), provided for expulsion for cause for their violation, with continuing liability for damages resulting from those causes, as set off against any amounts due from the Practice (§6.12).

2. The Practice suspended Dr. Yoser on May 15, 2008, and expelled him on May 30, 2008, after concluding Dr. Yoser had committed serious professional misconduct in breach of his fiduciary and other duties to the Practice, including among them:

    (a)    performing dry-needle -- or "fake" -- eye injections on patients;

    (b)    making "off-label" use of prescription drugs without prior patient consent;

16909 v1

(c) causing questionable or wrongful medical reimbursement claims to be submitted by the Practice;

(d) treating patients with substandard doses of medication;

and yet others, including:

(e) engaging in substandard practice standards exposing the Practice to recoupment and overpayment claims from third-party payors, including the Medicare program; and

(f) improperly accounting for and/or stealing prescription drugs from the Practice as part of a "bootleg" drug distribution conspiracy and continuing criminal enterprise.

The Practice has reported Dr. Yoser's activities, and his expulsion, to the appropriate authorities.

3. The Practice files these Claims to enforce the Operating Agreement, recover the damages caused by Dr. Yoser's activities, secure declarations of his continuing obligation to indemnify the Practice for as-yet unliquidated damages caused by his activities and for set-off against the amount(s) if any owed Dr. Yoser under the Operating Agreement, and for its attorneys' fees, costs and such other relief as equitable and just.

## PARTIES

4. VRF Eye Specialty Group, PLC is a Tennessee professional limited liability company, having its principal place of business in Memphis, Tennessee. It is the premier, multi-physician medical and surgical vision practice in the Mid-South.

5. Dr. Seth Yoser is an ophthalmologist, licensed to practice medicine in Tennessee, and a citizen and resident of Memphis, Tennessee. At all times relevant until his May 30, 2008 expulsion, Dr. Yoser was a member of the Practice.

6. James Baize is a citizen and resident of Cordova, Tennessee. As the Medical Solutions "salesman" for the stolen drugs, he was Yoser's co-conspirator in the drug-theft-and-distribution scheme.

7. Medical Solutions, LLC is a Tennessee limited liability company, having its principal place of business in Cordova, Tennessee, that Yoser and Baize used to run their drug-theft-and-distribution scheme.

## JURISDICTION AND VENUE

8. This Court has federal-question subject matter jurisdiction under 28 U.S.C. § 1331 by virtue of VRF's claim(s) under 18 U.S.C. §1964, and has supplemental jurisdiction of VRF's state-law claims under 28 U.S.C. § 1367.

9. Venue is proper in this District, under 28 U.S.C. § 1391(b), because Yoser resides, and a substantial part of the events giving rise to the Complaint occurred, in this District.

## DEFENDANTS' WRONGFUL CONDUCT

10. On at least May 12, 2008, Dr. Yoser engaged in professional misconduct by:

    (a) performing "fake" eye injections with a syringe containing no medication;

    (b) using the drug Avastin to treat macular degeneration (an off-label use) without notifying the patient or obtaining patient consent;

    (c) using the drug Avastin to treat macular degeneration, but causing claims to be submitted to third-party payors for the drug Lucentis; and

    (d) using a lower dose of Lucentis than appropriate to treat patients.

11. Upon discovery of Dr. Yoser's professional misconduct, on May 14, 2008 the Practice's Administrator, Mr. Thomas Brown, and the Practice's Chair of the Executive Committee, Dr. Subba Gollamudi, met with Dr. Yoser, who admitted engaging in such conduct.

12. On May 15, 2008, the Members of the Practice met to discuss Dr. Yoser's misconduct. Dr. Yoser was invited into the meeting after a period of time, and again admitted to misconduct on May 12, 2008. At the conclusion of the meeting, the Members decided to suspend Dr. Yoser for the remainder of the month pending further investigation into Dr. Yoser's misconduct.

13. The Practice's investigation revealed that Dr. Yoser committed the same professional misconduct in at least March and April of 2008. The investigation also revealed that Dr. Yoser engaged in misconduct by failing to follow VRF protocols and directions regarding the use and billing of Avastin, Lucentis and Visudyne, and by failing to properly account for the use of these drugs as purchased by VRF.

14. For example, each Lucentis box purchased by VRF was marked with two identical labels, each with its own letter-number combination. VRF's accounting procedure for the use of Lucentis suggested each physician administer *one dose* from each vial of Lucentis, and discard the remainder. One of the two labels would be placed on the patient's chart, and the other label would be placed on the patient's fee ticket. Dr. Yoser's practice, however, was to obtain the appropriate quantity of Lucentis to treat the number of patients he anticipated would need the medication that day. He then would remove the labels from each box and affix them to a single sheet of paper. Dr. Yoser would then work through his schedule administering *two doses* from each vial of Lucentis. Because he had obtained twice the number of vials of medication that he was actually using, he possessed a sufficient number of labels to justify each of the Lucentis injections he made while at the same time convincing VRF he was using each vial purchased by the Practice. Accordingly, a large quantity of Lucentis is missing from VRF's inventory for which Dr. Yoser is directly responsible. VRF purchases this drug for $1,950.00 per vial.

15. The Practice's continuing investigation has lead to information on which the Practice believes that Dr. Yoser embezzled/stole, using false pretenses, the remaining unused Lucentis belonging to the Practice, as well as another drug called "Visudyne," and improperly and fraudulently resold and/or re-distributed the drugs to Medical Solutions and others. Dr. Yoser therefore is responsible for the damages to the Practice resulting from his "diverted drug" scheme, in an amount to proven at trial, but which initial estimates place in excess of $3.4 million.

16. Yoser funneled the stolen drugs to Jim Baize and Medical Solutions. Medical Solutions -- in knowing concert and participation with Yoser and Baize -- re-sold the stolen drugs back to VRF and/others. Each sale involved invoices and telephone calls and/or emails and/or bank wires which constituted the use of the United States Postal Service and/or interstate wires in furtherance of a scheme or artifice to defraud, or to obtain money or property by means of false pretenses in violation of 18 U.S.C. §§ 1341 and 1343.

17. Each theft of a drug and each resale -- and each mail or wire transaction in connection with them -- was a separate predicate act. Yoser's scheme ran from approximately as early as the early-2000's until May 2008 and involved fraudulent re-sales to medical practices in other states as well. The scheme was continuing and would have continued, had VRF not uncovered it and turned Yoser into federal authorities.

18. Yoser, Baize and Medical Solutions are "persons."

19. VRF and Medical Solutions each are an "enterprise" engaged in, or the affairs of which affect, interstate commerce.

20. Yoser was employed by and associated with VRF and also was associated with Medical Solutions.

21.   Baize was employed by or associated with Medical Solutions. He also was associated with VRF as a salesman to the Practice.

22.   Yoser (and less-directly, Baize and Medical Solutions) participated in the conduct of VRF's affairs through a pattern of wrongful activity [18 U.S.C. § 1961(1)], unknown to and victimizing VRF.

23.   Yoser and Baize participated in the conduct of Medical Solutions's affairs through a pattern of wrongful activity, unknown to and victimizing VRF.

24.   Yoser's, and Baize's and Medical Solutions's activities injured VRF in its business and property.

25.   Following the Practice's internal investigation, the Members met on May 30, 2008, to discuss the appropriate course of action. The Members ultimately resolved that Dr. Yoser had:

> breached his fiduciary duties to the Company, and has engaged in misconduct and other acts and omissions that are injurious to the Company, its patients, members, business, reputation, and prospects, including, but not limited to, performing "fake" injections on patients for macular degeneration with a syringe containing no medication; using the drug Avastin to treat to macular degeneration (an off-label use) without notifying the patient or obtaining patient consent; using the drug Avastin to treat muscular degeneration, but causing a claim to be submitted to third-party payors for the drug Lucentis; using a lower dose of Lucentis than appropriate to treat a patient; failing to follow Company protocols and directions regarding use and billing of Avastin and Lucentis; and failing to properly account for the use of the drug Lucentis purchased by the Company.

Accordingly, the Members decided to expel Dr. Yoser from the Practice pursuant to Section 6.12(b) of the Operating Agreement in a Written Consent Action of the Members of the Practice.

26. Prior to the discovery of Dr. Yoser's misconduct, in February, 2008, the Practice was notified by a Medicare carrier of a still-disputed demand for reimbursement of alleged Medicare overpayments. Dr. Yoser's files comprise the major portion of that asserted liability.

27. The post-payment review revealed that Dr. Yoser's error rate was significantly higher than all other Members of the Practice. Dr. Yoser's errors and/or deliberate billing discrepancies resulted in almost half of the alleged overpayments. Dr. Yoser remains liable to the Practice for any substandard or wrongful conduct leading to such liability, pursuant to Operating Agreement §6.12(c) among others.

28. The Practice has incurred significant fees, costs and other damage in responding to Dr. Yoser's misconduct and continues to do so. Dr. Yoser is responsible for those fees and costs pursuant to Operating Agreement §6.12(c)(ii), which provides a Member "shall be liable to the Company and the remaining Members for any and all damages caused by the acts or omissions that gave rise to his Expulsion For Cause, including, without limitation, attorneys' fees and disbursements incurred in connection therewith (whether at trial, on appeal or otherwise)."

29. While a Member of the Practice, Dr. Yoser loaned the Practice money, consisting of a $250,000 principal balance "Practice Loan" under a Subordinated Promissory Note dated December 29, 2006 and also a $205,000 principal balance "Building Loan" under a Subordinated Promissory Note dated June 26, 2007. These, and all other amounts due Dr. Yoser from the Practice (if any): (a) are subject to the parties' written agreement; and, (b) should be set-off as against the Practice's claims against Dr. Yoser.

## COUNT I - CIVIL RICO:
## DEFENDANTS' PARTICIPATED IN THE CONDUCT
## OF THE VICTIM ENTERPRISE, VRF

30. The Practice incorporates by reference its allegations above.

31. Yoser, Baize and Medical Solutions each is a "person" as defined in 18 U.S.C. § 1961(3).

32. The Practice is an "enterprise" as defined in 18 U.S.C. § 1961(4), engaged in or the affairs of which affect interstate commerce.

33. Yoser was employed by or associated with, and Baize and Medical Solutions were associated with, the Practice.

34. As detailed above, Yoser (and Baize and Medical Solutions) used the United States Postal Service and interstate wires in furtherance of a scheme or artifice to defraud, or to obtain money or property by means of false pretenses in violation of 18 U.S.C. §§1341 and 1343.

35. Each such use of the mails or interstate wires was a "predicate act" of racketeering activity as defined in 18 U.S.C. §1961(1).

36. Each of those "predicate acts" were related to and furthered Yoser's, Baize's and Medical Solutions's drug-theft-and-resale scheme.

37. Those predicate acts were repeated and continued from at least August 2006 (and on information and belief as early as 2000) through May 2008. They were continuing and would have continued further, if the Practice had not uncovered Yoser's scheme and reported it to federal authorities. Thus, taken together, Defendants' acts constituted a "pattern of racketeering activity" as defined in 18 U.S.C. §1961(5).

38. Unknown to VRF, Yoser (and Baize and Medical Solutions) participated in the conduct of the Practice's affairs, victimizing it, through a pattern of racketeering activity as defined in 18 U.S.C. § 1962(c).

39. Defendants' activities injured the Practice in its business or property by reason of their violation of 18 U.S.C. § 1962. The Practice should recover threefold its damages, costs and attorneys' fees.

### COUNT II - CIVIL RICO: YOSER AND BAIZE PARTICIPATED IN THE CONDUCT OF THE CRIMINAL ENTERPRISE, MEDICAL SOLUTIONS

40. The Practice incorporates by reference its allegations above.

41. Yoser and Baize each is a "person" as defined in 18 U.S.C. § 1961(3).

42. Medical Solutions is an "enterprise" as defined in 18 U.S.C. § 1961(4), engaged in or the affairs of which affect interstate commerce.

43. Yoser and Baize were employed by or associated with Medical Solutions.

44. As detailed above, Yoser and Baize used the United States Postal Service and interstate wires in furtherance of a scheme or artifice to defraud, or to obtain money or property by means of false pretenses in violation of 18 U.S.C. §§1341 and 1343.

45. Each such use of the mails or interstate wires was a "predicate act" of racketeering activity as defined in 18 U.S.C. §1961(1).

46. Each of those "predicate acts" were related to and furthered their drug-theft-and-resale scheme.

47. Those predicate acts were repeated and continued from at least August 2006 (and on information and belief as early as 2000) through May 2008. They were continuing and would have continued further, if the Practice had not uncovered Yoser's scheme and reported it to

Federal authorities. Thus, taken together, Defendants' acts constituted a "pattern of racketeering activity" as defined in 18 U.S.C. §1961(5).

48. Unknown to VRF, Yoser and Baize participated in the conduct of and maintained their control of Medical Solutions's affairs, as a criminal enterprise, through a pattern of racketeering activity as defined in 18 U.S.C. § 1962(b-c).

49. Defendants' activities injured the Practice in its business or property by reason of their violation of 18 U.S.C. § 1962. The Practice should recover threefold its damages, costs and attorneys' fees.

## COUNT III - CIVIL RICO: YOSER'S AND BAIZE'S RACKETEERING CONSPIRACY

50. The Practice incorporates by reference its allegations above.

51. Yoser and Baize each is a "person" as defined in 18 U.S.C. § 1961(3).

52. The Practice and Medical Solutions each is an "enterprise" as defined in 18 U.S.C. § 1961(4), engaged in or the affairs of which affect interstate commerce.

53. Yoser and Baize were employed by or associated with VRF and Medical Solutions.

54. As detailed above, Yoser and Baize used the United States Postal Service and interstate wires in furtherance of a scheme or artifice to defraud, or to obtain money or property by means of false pretenses in violation of 18 U.S.C. §§1341 and 1343.

55. Each such use of the mails or interstate wires was a "predicate act" of racketeering activity as defined in 18 U.S.C. §1961(1).

56. Each of those "predicate acts" were related to and furthered their drug-theft-and-resale scheme.

57. Those predicate acts were repeated and continued from at least August 2006 (and on information and belief as early as 2000) through May 2008. They were continuing and would have continued further, if the Practice had not uncovered Yoser's scheme and reported it to Federal authorities. Thus, taken together, Defendants' acts constituted a "pattern of racketeering activity" as defined in 18 U.S.C. §1961(5).

58. Unknown to VRF, Yoser and Baize conspired to conduct or participated in the conduct of VRF and/or Medical Solutions's affairs, through a pattern of racketeering activity as defined in 18 U.S.C. § 1962(d).

59. Defendants' activities injured the Practice in its business or property by reason of their violation of 18 U.S.C. § 1962. The Practice should recover threefold its damages, costs and attorneys' fees.

## COUNT IV - YOSER'S BREACH OF DUTY

60. The Practice incorporates by reference its allegations above.

61. By his wrongful conduct and otherwise, Dr. Yoser has breached his fiduciary, contractual and other duties to the Practice, causing damages in an amount to be proven at trial and for which Dr. Yoser is liable.

## COUNT V - DEFENDANTS' DECEPTION, THEFT AND MISAPPROPRIATION

62. The Practice incorporates by reference its allegations above.

63. The Practice is informed and believes that Dr. Yoser, in active concert and participation with others, has wrongly taken and converted to his own use property belonging to the Practice, including without limitation stores of Lucentis and Visudyne, causing damages in an amount to be proven at trial and for which Defendants are liable.

64. While under a duty of disclosure to the Practice, Dr. Yoser concealed and/or omitted to disclose his theft or misappropriation of Practice property. Baize and Medical Solutions at least impliedly misrepresented to the Practice that the drugs sold to the Practice were "genuine" and did not disclose they were stolen.

### COUNT VI - YOSER: INDEMNIFICATION FOR MISCONDUCT

65. The Practice incorporates by reference its allegations above.

66. Pursuant to Section 6.12(c)(ii) of the Operating Agreement, the Practice and the remaining Members are entitled to recover "any and all damages caused by the acts or omissions that gave rise to [Dr. Yoser's] Expulsion For Cause, including, without limitation, attorneys' fees and disbursements incurred in connection therewith (whether at trial, on appeal or otherwise)." Additionally, under Section 6.12(d), any payment of damages shall be withheld from any positive balance that the expelled Member has with the Practice. Further, pursuant to Section 6.8(b)(i) of the Agreement, "[e]ach Person who renders a Professional Service as a Member, an Interest Holder, Manager, employee or other agent of the company is liable for *his or her own negligent or wrongful acts* or omissions to the same extent as if such Person rendered the services as a sole practitioner . . . ." (emph. added).

67. As a result of Dr. Yoser's misconduct, the Practice believes it may face civil claims and/or be assessed fines or penalties by one or more governmental organizations and/or one or more professional health care organizations, in addition to those presently having been asserted by a Medicare carrier. The Practice also believes that third party payors who were billed by Dr. Yoser for medication that was not actually used, or for which a less expensive medication was substituted, will seek recovery of expenses and damages.

68. VRF is entitled to a declaratory judgment that it is indemnified from any and all claims arising from Dr. Yoser's misconduct, for which he was expelled, and that VRF is entitled to recover from Dr. Yoser an amount equal to any and all fines, penalties and any other damages assessed against VRF as a result of Dr. Yoser's misconduct.

69. VRF is further entitled to a declaratory judgment that VRF is entitled to recover any and all attorney fees and costs resulting from the defense of any action brought against it as a result of Dr. Yoser's misconduct.

## COUNT VII - CONTRIBUTION TO MEDICARE REIMBURSEMENT

70. The Practice incorporates by reference its allegations above.

71. To the extent that the Practice and/or its Members are required to reimburse Medicare for alleged overpayments as sought by a Medicare carrier, Dr. Yoser, although no longer a Member of the Practice, is directly responsible for most of these overpayments as will be proven at trial.

72. The Practice is entitled to a declaratory judgment that Dr. Yoser remains responsible for that portion of the alleged overpayment attributable to his conduct.

## COUNT VIII - SET OFF

73. The Practice incorporates by reference its allegations above.

74. Any amounts due from the Practice to Dr. Yoser should be set off against the damages and other amounts due from Dr. Yoser to the Practice.

## COUNT IX - DECLARATORY JUDGMENT

75. The Practice incorporates by reference its allegations above.

76. The Practice is entitled to a declaratory judgment that any judgment in favor of the Practice and against Dr. Yoser, based upon the activities described above constitutes:

      a.    "A debt for money obtained false pretenses, a false representation, or actual fraud," within the meaning of 11 U.S.C. sec. 523(a)(2)(A); and/or,

      b.    "A debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny," within the meaning of 11 U.S.C. sec. 523(a)(4).

## JURY DEMAND

77.    The Practice demands a trial by jury.

**WHEREFORE**, VRF Eye Specialty Group, PLC respectfully requests that the Court enter its judgment against Yoser, Baize and Medical Solutions, jointly and severally, granting VRF the following relief:

    A.    Monetary damages (general and special, consequential and incidental) in amount to be proven at the hearing resulting from Defendants' misconduct, plus attorneys fees', costs and expenses;

    B.    Treble damages, fees and costs;

    C.    Punitive damages resulting from Defendants' intentionally wrongful and deceptive misconduct;

    D.    A declaration that Dr. Yoser remains liable to the Practice for all damages, fees and costs resulting from his misconduct, including without limitation that portion of the Medicare reimbursement demand now pending against the Practice that is attributable to Dr. Yoser's actions.

    E.    That all costs be taxed against Defendants;

    F.    Prejudgment interest on all amounts from the date of damage or expenditure, together with post-judgment interest upon any award from the date of award until paid at the highest amount allowed by law; and

G.  For such other and further relief as equitable and just.

Eye Specialty Group reserves the right to amend this Complaint as further information may become available to it in discovery or otherwise.

March 30, 2009                    Respectfully submitted:

*/s/ Thomas K. Potter, III*
Thomas K. Potter, III (T.A.) (TN Bar# 024857)
Katherine Knight Layhew (TN Bar# 022274)
**BURR & FORMAN LLP**
700 Two American Center
3102 West End Avenue
Nashville, Tennessee 37203
Telephone: (615) 724-3231
Facsimile: (615) 724-3331
E-mail: tpotter@burr.com
*Attorneys for VRF Eye Specialty Group, PLC*

16909 v1                          15

## VERIFICATION

A representative for VRF Eye Specialty Group, PLC, declares under penalty that the foregoing Complaint is true to the best of his or her knowledge, information and belief.

Memphis, Tennessee, this 30th day of March, 2009

_____
Subba R. Gollamudi, M.D.
Member
VRF – Eye Specialty Group, PLLC
825 Ridge Lake Blvd.
Memphis, Tennessee 38120

16909 v1